Filed 7/12/23  P. v. Smith CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F084356 |
| Plaintiff and Respondent, | (Super. Ct. No. VCF408559) |
| v. | |
| COTIS SMITH, | **OPINION** |
| Defendant and Appellant. | |

### <u>THE COURT</u>[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Franson, Acting P. J., Smith, J. and DeSantos, J.

Defendant Cotis Smith pled guilty to one count of being a felon in possession of a firearm and one count of illegal possession of ammunition, and a jury convicted him of one count of assault with a firearm and one count of shooting at an occupied motor vehicle. After the verdict, the trial court sentenced defendant to a total term of seven years. On appeal, defendant contends that: (1) the prosecutor committed misconduct by violating a pretrial evidentiary order; (2) the prosecutor committed misconduct by misstating the law on self-defense; (3) alternatively, if forfeiture is found, then defense counsel was prejudicially ineffective for failing to object to prosecutorial misconduct and the cumulative effect of the misconduct was prejudicial; (4) the sentencing minute order and abstract should be amended to reflect the court's oral pronouncement; and (5) the court erred when it failed to stay the sentences for illegal possession of ammunition and shooting at an occupied motor vehicle. We direct the court to correct the sentencing minute order and abstract, and we stay the sentences for illegal possession of ammunition and shooting at an occupied motor vehicle. In all other respects, we affirm.

## PROCEDURAL BACKGROUND

On September 7, 2021, the Tulare County District Attorney filed an amended information charging defendant with assault with a firearm (Pen. Code, § 245, subd. (a)(2);[1] count 1), shooting at an occupied motor vehicle (§ 246; count 2), being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 3), and illegal possession of ammunition (§ 30305, subd. (a)(1); count 4). As to count 1, the amended information alleged that defendant personally used a firearm in commission of the offense (§ 12022.5, subd. (a)). Prior to trial, defendant pled no contest to counts 3 and 4.

---

[1] All statutory references are to the Penal Code unless otherwise noted.

On December 10, 2021, the jury found defendant guilty on the remaining two counts and found true that defendant personally used a deadly weapon while committing count 1.

On April 4, 2022, the court sentenced defendant to an aggregate term of seven years as follows:  as to count 1, three years (the midterm), plus a four-year (the midterm) personal use of a firearm enhancement; as to count 2, five years (the midterm), to be served concurrently with the sentence on count 1; as to count 3, two years (the midterm) to be served concurrently with the term on count 2; and count 4, two years (the midterm) to be served concurrently with count 2.

## FACTUAL BACKGROUND

The jury was shown a composite video that consisted of images captured by several video cameras on June 29, 2020, at a Visalia gas station.  The video depicted defendant driving his car into the gas station parking lot and pulling into a fueling stall. Defendant can be seen pumping gas into his car and talking to his friend, who was a passenger in defendant's car.  While defendant pumped gas, a black car drove into the gas station parking lot.  Defendant and his friend noticed the black car as it approached and turned into the gas station.  The video depicted defendant's friend quickly getting out of the front passenger seat and looking around, defendant attempting to put the gas nozzle back into the fuel pump but letting the nozzle drop to the ground, defendant and his friend quickly going to the driver's side door of defendant's car, and defendant popping the hood to his car.  As defendant opened his driver's side door to pop the hood, the black car pulled next to the gas station's convenience store entrance, directly across from defendant's car.  Defendant and the black car were separated by a fuel pump, and there appeared to have been approximately 20 to 30 feet between the two cars.  After defendant popped the hood of his car, he looked at the black car and walked to the front of his car to

3.

open the hood.[2]  As defendant was opening the hood of his car, the driver's side door of the black car opened slightly.  Once defendant fully opened the hood, the black car started to leave, and a white pick-up truck pulled between defendant's car and the black car.  Defendant then retrieved the handgun that he had stored under the hood and began to run after the black car.  As the black car was leaving the gas station, the driver's side door opened wider.  However, the black car continued to drive away quickly, and the driver's side door eventually closed.  After the black car's door closed and the black car was out of view of the security camera, defendant ran towards the fleeing black car and aimed his handgun while running.  Although the video does not clearly depict it, defendant fired two shots from his handgun at the black car.  Defendant then stopped, ran back to his car, and drove away.

Apart from the video, defendant testified that 10 days before the incident at the gas station, he and another friend were the victims of a drive-by shooting.  Defendant was driving to a gas station before going to work when his friend waved him down from the side of the road.  Defendant parked his car along the sidewalk facing oncoming traffic and spoke with his friend.  As he was talking, he noticed the same black car.  The black car was driving abnormally slow, and when the hoods of the two cars were in alignment, the driver of the black car took out a handgun and shot at defendant.  Defendant ducked below the steering wheel and heard multiple gunshots.  Defendant testified that he heard his friend yell, and then defendant quickly drove away.  After defendant had gotten away, he saw that there was a bullet hole in his car doorframe.  Defendant later drove back to the scene of the shooting and learned that his friend had been shot and taken to the hospital.  The police investigated this shooting but were unable to locate the driver of the black car.  Defendant testified that he had never been shot at before and became fearful.

---

[2]  A witness testified that it looked like the defendant and the driver of the black car made eye contact with each other.

4.

He purchased a handgun illegally "off the street" for protection and hid the gun under the hood of his car.

Defendant testified that on the day of the incident, he was shocked to see the same black car again after his friend pointed it out. He was transfixed by the black car and decided to pop the hood of his car just in case he needed the gun. Defendant did not think about getting into his car and driving away. He had no doubt it was the same driver who had shot his car and his friend 10 days prior. Defendant testified that after he popped the hood and the black car had pulled in across from him, he saw the driver's hand disappear behind the door. Defendant speculated that the driver may have been trying to put the car in gear, but it appeared to defendant that the driver had a gun in his hand. Defendant then saw the black car start to drive off and he retrieved his gun. Defendant clarified that it was the driver's action of reaching down or lowering his hand that caused defendant to get the gun. Although the video depicts the black car's driver's side door open slightly shortly before the black car drove away, defendant testified that he did not see the door open. Defendant "got a little low" because he thought the driver might start shooting. Defendant testified that he saw the white truck pull in, and then the next time he saw the black car, it was driving out of the gas station and the driver's side door "flew" open. Defendant testified that he thought that the driver was going to try to get out of his car and start shooting at him. Defendant explained that he decided to start running towards the black car so that if the driver started to get out, defendant would have the upper hand. Defendant testified that he was very scared even though he had his gun out because he believed that he might get shot. Defendant kept running towards the black car and fired two shots after the black car's door had shut. Defendant explained that he believed that the driver was trying to get into a better position to shoot at him and that he fired because the black car was decelerating. Defendant testified that he did not want to hurt anyone, so he aimed away from the car and fired two shots to scare the black car away. After he fired, the black car accelerated again, and defendant ran back to his

5.

car.  Defendant testified that the black car was about a half a block, four "house lengths," or within 150 feet away when defendant fired his handgun.  Defendant testified that he was scared and believed that he was acting in self-defense as the black car was driving away.

## DISCUSSION

### I.  Forfeiture of Prosecutorial Misconduct

#### A.      Parties' Arguments

Defendant argues that the prosecutor engaged in misconduct twice, once during cross examination and once during closing arguments.  Defendant acknowledges that defense counsel did not object to either instance of purported misconduct, but argues that if forfeiture is found, then his defense counsel was constitutionally ineffective.

The People note that defense counsel did not make any objections to prosecutorial misconduct.  They argue that because there is no indication that an objection would have been futile or that an admonition would have been inadequate, defendant has forfeited his misconduct claims.

We agree with the People.

#### B.      Legal Standards

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Parker* (2022) 13 Cal.5th 1, 71–72.)  " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943.)

6.

### C. Analysis

There is no dispute that defense counsel failed to object to any form of prosecutorial misconduct either during cross-examination or closing arguments. Defendant does not argue an objection would have been futile or contend that an admonition would have been inadequate to cure any harm, but instead contends that counsel was ineffective. Based on our review of the record, and because defendant implicitly concedes forfeiture without identifying any exceptions, we conclude that defendant's claim of prosecutorial misconduct has been forfeited. (*People v. Parker*, *supra*, 13 Cal.5th at pp. 71–72; *People v. Hoyt*, *supra*, 8 Cal.5th at pp. 942–943; see also *People v. Lopez* (2008) 42 Cal.4th 960, 966 ["A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel."].)

## II. Ineffective Assistance of Counsel

### A. Parties' Arguments

#### 1. Defendant

Defendant argues that the prosecutor engaged in two forms of misconduct. First, prior to trial, the prosecutor filed a motion to impeach defendant with five felony convictions. The trial court determined that the prosecutor could specifically identify two felonies but could refer to the other convictions only as "felonies." The prosecutor did not request that the number of felonies be provided, and the court's order clearly permitted only a generic reference to "felonies." The prosecutor violated the order by asking defendant if he had been convicted of *eight* felonies. The sole contested issue was self-defense, which rested heavily on defendant's credibility. The prosecutor's identification of eight felonies in violation of the court order could have pushed the jury to find that defendant lacked veracity. Thus, the question was a violation of due process or at least misconduct under state law that prejudiced his defense. Additionally, in reply, defendant argues that there could be no valid strategic reason for defense counsel to agree

to an increase of the number of impeachable offenses from five to eight without a hearing.

Second, the prosecutor misstated the law on self-defense during closing argument. The prosecutor essentially told the jury that defendant could not have acted reasonably, and could not invoke self-defense, because he had eight felonies. The prosecutor's argument misstated the law and short-circuited the process of determining whether defendant reasonably perceived an imminent threat. Moreover, the prosecutor's conduct constituted structural error because it removed self-defense from the case. If defendant could never act reasonably or utilize self-defense because of past convictions, then all testimony and arguments regarding his fears became immaterial.

Defendant also argues that, even if the two instances of misconduct were not individually enough to demonstrate prejudice, the cumulative effect of the errors was prejudicial and requires reversal.

### 2. *The People*

The People respond that defense counsel was not ineffective. With respect to the prosecutor's question on cross-examination, there are several conceivable explanations for defense counsel's actions. It is conceivable that there was no objection because there was no violation of the court's pre-trial order. The court did not explicitly prohibit reference to the number of felonies. Also, the court instructed the parties to meet and confer regarding admission of the felonies, and the issue was not raised again. It is possible that any issues were addressed between counsel during the meet and confer efforts. The People also argue that there was no prejudice because the jury heard that defendant had two prior felony firearm possession convictions and had illegally purchased a handgun. This adequately demonstrated defendant's character, and the jury's impression would not have been swayed by the fact that defendant had eight felony convictions.

With respect to closing arguments, the People argue that defense counsel may not have objected because he knew any objection would be frivolous. It is not a misstatement of the law to argue that the objective "reasonable person" against whom the jury evaluates defendant's conduct in deciding whether he acted in self-defense is not a person who has suffered eight felony convictions. The prosecutor was entitled to comment that the personal characteristic of having eight prior felony convictions went beyond the objective reasonable person standard. The People also argue that there was no prejudice because the jury was properly instructed on the law.

Finally, the People argue that because there was no deficient performance with respect to the cross-examination of defendant or the prosecutor's closing argument, there is not cumulative error.

We agree with the People that defendant did not receive ineffective assistance of counsel.

### B.    *Additional Background*

#### 1.    *Pre-Trial Ruling and Questions of Defendant*

Prior to trial, the prosecutor moved in limine to admit five prior felonies to impeach defendant. At the hearing, the prosecutor explained that he wanted to introduce the felonies if defendant testified at trial. The trial court informed defense counsel that if defendant testified, "obviously the [prosecutor] is allowed to get into evidence of [defendant's] prior convictions for felonies …." Defense counsel stated that he would not object if the felonies were unspecified and referred to as "felonies." The prosecutor requested that the court not sanitize defendant's two prior firearm possession convictions (§ 12021, subd. (a)) if defendant testified. The prosecutor also explained that, even though the motion listed only one prior conviction for firearm possession, there were actually two prior convictions for that offense. When the court stated that it saw only one such conviction, the prosecutor explained: "I just put one just to state that my intention was to use it. But I have two, one in 2009 and one in 2011." An off-the-record

conversation occurred, and the court eventually ruled that "the felonies under [Health and Safety Code section] 11351.5, [Health and Safety Code section] 11379,[3] [section] 69, and [section] 273.5, the specific type of felonies cannot be referred to.… But the [section] 12021(a) [conviction] from 2009 and the [section]12021(a) [conviction] from 2011 can be referred to specifically…. Those are the only two …. I don't want to hear about the [Health and Safety Code section] 11379 [conviction]." The prosecutor then asked how the court would like the felonies introduced, and the court responded by asking defense counsel about a stipulation. In order to avoid introducing criminal history packets, defense counsel stated that he was willing to stipulate to the fact of conviction so long as the section 12021 convictions were referred to by year. The court responded, "I want you to meet and confer. You make sure you have that cleared up. Okay?" Defense counsel agreed, and the hearing concluded.

On direct examination, defendant testified that he had a criminal past, had "some felonies," and knew that it was illegal for him to possess a gun. On cross-examination, the prosecutor asked if defendant had twice been convicted of possessing a gun as a prohibited person, to which defendant responded affirmatively. The prosecutor also asked, "And what [defense counsel] did not tell you is that you have one, two—you have eight felonies on record, is that right, Mr. Smith?" Defendant responded that he did not know how many felonies he had, but that he guessed it was possible that he could have that many felonies on his record.

---

**3** The prosecutor's motion erroneously identified the two Health and Safety Code sections as Penal Code sections.

## 2.    *Closing Argument*

During closing argument, the prosecutor discussed the self-defense instruction and the subjective-objective parts of self-defense. The prosecutor explained that a person must not only subjectively believe that there is imminent danger, but that the person's subjective belief also must be objectively reasonable. The prosecutor also informed the jury that the instructions directed the jury to consider all circumstances known to and apparent to the defendant. The prosecutor acknowledged that prior knowledge can be considered. The prosecutor then argued:

> "And then once you look at those circumstances, consider what a reasonable person would do in a similar situation, similar knowledge, defendant's belief were reasonable, the danger did not have actually existed. [Sic.] Reasonable person, it's not someone with eight felonies. It's someone common, [everyday] individuals, it is you, ladies and gentlemen. You decide what a reasonable person would do."

The prosecutor also told the jury to judge defendant by his actions, which did not show self-defense. The prosecutor asked what a reasonable person would believe as the black car was driving away and argued that a reasonable person would not have gone to a place where he would be exposed if he truly acted in self-defense. The prosecutor averred that defendant's actions showed that he did not believe he was in imminent danger and that a reasonable person would not have believed defendant to have been in danger.

During defendant's closing argument, defense counsel focused on the self-defense instruction that the jury was to consider all the circumstances as they were known to and appeared to the defendant. Defense counsel then pointed out that the reasonable person standard had a "similar knowledge" component, which meant similar knowledge to the defendant. Defense counsel then argued that defendant could still rely on information that later proved to be false, and defendant was not required to retreat. Defense counsel also pointed out that the prosecutor's argument was not evidence but was simply a guide.

During rebuttal, the prosecutor argued that if the jury believed that defendant had been shot at, and if it was assumed that defendant believed that he needed to arm himself, that he was scared, and did not know what was going to happen, and that he did not have a felony criminal history, then there was still not self-defense. Through rhetorical questions, the prosecutor argued that there was no self-defense because the defendant acted offensively by chasing and shooting at the black car as the black car was attempting to drive away. The prosecutor emphasized that the jury was to judge defendant's actions, not simply his beliefs.

### C. Legal Standard

#### 1. Ineffective Assistance of Counsel

The Sixth Amendment guarantees " ' the right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) "A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." (*Buck v. Davis* (2017) 580 U.S. 100, 118; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).) A deficient performance is one in which counsel "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) There is " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*Woods v. Donald* (2015) 575 U.S 312, 315; *People v. Stanley* (2006) 39 Cal.4th 913, 954.) That is, there is a presumption "that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' " (*Cullen v. Pinholster* (2011) 563 U.S. 170, 196; *Strickland*, at p. 690; *People v. Padilla* (1995) 11 Cal.4th 891, 935.) Courts will " 'defer[ ] to counsel's reasonable tactical decisions[.]' " (*Arredondo*, at p. 711; see also *Cullen*, at p. 195.) Prejudice occurs where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been" more favorable to the defendant. (*Strickland*, at p. 694; *Stanley*, at

p. 954.)  In turn, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; *Stanley*, at p. 954.)

Ineffective assistance of counsel claims should generally be pursued through habeas corpus proceedings.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–268.)  This is because on direct appeal, a court may find deficient performance only if:  " '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Mai*, at p. 1009.)  If counsel's " 'tactics or strategic reasons for challenged decisions do not appear on the record,' " courts will not find ineffective assistance of counsel " 'unless there could be no conceivable reason for counsel's acts or omissions.' " (*Johnsen*, at p. 1165).  Given this framework, "[r]arely is ineffective assistance of counsel established on [direct] appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

### 2.     *Prosecutorial Misconduct*

"[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Parker v. Matthews* (2012) 567 U.S. 37, 45; see also *People v. Dworak* (2021) 11 Cal.5th 881, 909.)  Conduct by the prosecutor "that falls short of a federal due process violation may … violate state law if it 'involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*Dworak*, at p. 910; *People v. Bell* (2019) 7 Cal.5th 70, 111.)  Prosecutors are " 'given wide latitude to vigorously argue [their] case and to make fair comment on the evidence, including [making] reasonable inferences or deductions that may be drawn from the evidence.' " (*Dworak*, at p. 910; see also *People v. Lewis* (1990) 50 Cal.3d 262, 283 [noting that a prosecutor "has the right to fully state his views as to what the evidence shows and urge whatever

conclusions he deems proper"].)  While " 'prosecutors may attack the defense case and argument' " (*People v. Krebs* (2019) 8 Cal.5th 265, 342), and " 'comment upon the credibility of witnesses based on facts contained in the record' " (*People v. Peoples* (2016) 62 Cal.4th 718, 796), the prosecutor cannot "misstate facts" (*People v. Powell* (2018) 6 Cal.5th 136, 183), " 'misstate the law generally' " (*Bell*, at p. 111), "elicit or attempt to elicit … evidence in violation of a court ruling" (*People v. Silva* (2001) 25 Cal.4th 345, 373), or "argue facts or inferences not based on the evidence presented." (*Lewis*, at p. 283.)  "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

> **D.      Analysis**
>
> > **1.      Misconduct During Cross-Examination**
> >
> > > **a.      Deficient performance**

Defendant contends his defense counsel was deficient for not objecting that the prosecutor's felony conviction questions violated the trial court's evidentiary ruling. There is no dispute that defense counsel did not object to this line of questioning and did not explain on the record why he did not object.  Therefore, we will not find a deficient performance unless there was no conceivable reason for defense counsel's omissions. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

We agree with the People that the prosecutor did not violate the trial court's evidentiary ruling by specifying the number of felony convictions in defendant's record. The court made clear that if defendant testified, the prosecutor would be able to use the felonies for impeachment purposes.  However, the manner of use was to be sanitized by prohibiting the specific identification of any felony, save for the two felon in possession of a firearm convictions.  The court did not expressly prohibit referencing the number of felonies suffered, and neither the court nor the parties argued or expressed concern that

14.

there was a problem with identifying the number of felonies. Thus, the court's concern was to sanitize the description or naming of the felonies, not to limit the number of felonies that could be used to impeach. This is consistent with case law. "[T]here is no limitation on the number of prior [felony] convictions" that can be admitted to impeach a defendant's credibility. (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 927; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 646.) Indeed, a series of crimes is generally more probative of a defendant's veracity than a single crime (*People v. Clark* (2011) 52 Cal.4th 856, 932; *People v. Stewart* (1985) 171 Cal.App.3d 59, 66), and courts have recognized that substantially limiting the number of felonies to be used for impeachment may improperly clothe the defendant in a "false aura of veracity[.]" (*Mendoza*, at p. 927; see *People v. Hinton* (2006) 37 Cal.4th 839, 888 [holding that impeachment through the available felonies, although they were similar to the charged offenses, was proper because otherwise the testifying defendant would have had a "false aura of veracity"].) Allowing impeachment after the identification of six felony convictions, but then permitting only a general reference to "felonies" without identifying the number of felonies, implicates the danger of clothing defendant with a "false aura of veracity[.]" (*Mendoza*, at p. 927.) Specifically, the implication could be that defendant suffered as few as two felony convictions when the reality is quite different. In the absence of a clear ruling by the court to the contrary, we cannot hold that that the court prohibited references to the number of defendant's felony convictions or that the prosecutor engaged in misconduct by identifying the number of defendant's felony convictions.

Because we conclude that the trial court did not proscribe references to the number of defendant's convictions, we can conceive of an explanation for why defense counsel did not object to the prosecutor's questioning. After ruling that defendant's felonies were to be referred to generally as "felonies," the court required the parties to meet and confer and "clear up" how the felonies would be introduced. It can reasonably be assumed that

15.

the prosecutor and defense counsel followed the court's order and met to determine the method of introducing the felonies. Considering the prosecutor's identification of numerous felony convictions, as well as the case law that recognizes the danger of clothing a defendant with a false aura of veracity, it is possible that defense counsel and the prosecutor agreed that the prosecutor could generally refer to the specific number of felonies on defendant's record (except for the two section 12021 convictions, which could be specifically identified). Such an agreement would be consistent with both the court's evidentiary ruling and existing case law.

In reply, defendant contends that there was no reasonable basis for defense counsel to agree to increase the number of felony convictions to eight when only five felony convictions were disclosed and subject to the trial court's review. Defendant does not argue that the eight felony conviction figure is incorrect or that defendant does not actually have eight felony convictions that could be used for impeachment. Moreover, the probation officer's report identified two additional felony convictions that could have been admitted for impeachment purposes.[4] At sentencing, defendant's

---

**4** The probation report showed that defendant had felony convictions for concealing a firearm within a vehicle (former § 12025, subd. (a)(1), now § 25400, subd. (a)(1)), and for felon in possession of ammunition (former § 12316, subd. (b)(1), now § 30305, subd. (a)(1)). Section 12025 has been held to be a crime of moral turpitude for purposes of impeachment. (*People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1019.) Although we are unaware of any published authority that analyzes section 12316, subdivision (b)(1) for impeachment, "[n]umerous crimes involving firearms have been held to involve moral turpitude." (*Id*. at 1018.) Crimes involving firearm possession by a felon are deemed crimes of moral turpitude because the felon's prior conduct demonstrates that he or she is likely to use the firearm to do evil. (*People v. Robinson* (2011) 199 Cal.App.4th 707, 713–715; *People v. Littrel* (1986) 185 Cal.App.3d 699, 702–703.) Ammunition is meant to do one thing—be discharged from a firearm. It is from the marriage of ammunition with a firearm that the greatest potential for evil exists. Given ammunition's relationship to firearms, and the harm that can result from the use of ammunition, we detect no reason why the rationales of *Robinson* and *Littrel* would not apply to the section 12316 conviction. Therefore, the trial court could have relied on

16.

counsel did not dispute the accuracy of any conviction in the probation report.[5] Therefore, the record demonstrates a basis for the eight felony figure.

In its evidentiary ruling, the trial court considered six felony convictions (the five felony convictions disclosed in the motion and the second section 12021 conviction identified at the hearing) and permitted the prosecutor to use all felonies for impeachment. Again, the only expressed concern and limitation on the use of the felonies dealt with how to reference the felony convictions, not with the number of convictions. There is nothing in the record that reasonably indicates that the court would have excluded the two undisclosed felony convictions, other than by prohibiting the prosecutor from identifying them by name. Further, since the two additional felonies could only be referred to as "felonies," there appears to be little difference between impeachment through a reference to "six felonies" and impeachment through a reference to "eight felonies." Given existing case law and the court's ruling, we believe that counsel could have reasonably concluded that the difference between six and eight convictions was insubstantial and that the court would not have excluded the two undisclosed felonies for purposes of impeachment. In light of the strong presumption that counsel's representation was reasonable and not deficient, we cannot conclude that counsel was deficient for permitting the prosecutor to reference eight felonies. (*Woods v. Donald*, *supra*, 575 U.S at p. 315; *Cullen v. Pinholster*, *supra*, 563 U.S. at pp. 195–196; see also *Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

In sum, in the face of a silent record, we conclude that it is reasonably conceivable that defense counsel and the prosecutor met and conferred and agreed that the prosecutor

---

*Aguilar* and the rationales of *Littrel* and *Robinson* to admit these two additional felony convictions.

[5] At sentencing, defense counsel's only correction regarding the accuracy of defendant's prior convictions identified in the probation report was regarding the date of defendant's prior prison commitment.

could question defendant about being convicted of "eight felonies," but could only specifically identify two section 12021 offenses. Because this is a conceivable explanation for defense counsel's failure to object to the prosecutor questioning defendant about eight felony convictions, defendant has failed to show deficient performance. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

### b. Prejudice

In the alternative, even if we concluded that counsel was deficient for not objecting to the reference to eight felonies, we would conclude that this error is not prejudicial. First, the prosecutor never fully established before the jury that defendant had been convicted of eight felonies. As explained above, when asked about eight felonies, defendant first responded that he did not know the actual number but that he *guessed* it was *possible* that eight was accurate. Therefore, the jury only knew that defendant had been convicted of a number of felonies that might or might not be as high as eight. Second, we accept that theoretically there may be a case in which the number of felonies is so high that admitting all convictions would be unduly prejudicial. However, the prosecutor disclosed six convictions at the hearing, and there was no suggestion of limiting that figure. Therefore, the prosecutor could have asked defendant if he had been convicted of six felonies, and such a question would not have been objectionable as a violation of the court's evidentiary ruling. We do not see a significant difference between six and eight felonies in terms of assessing defendant's veracity, particularly when they are referred to simply as "felonies." Courts have approved of impeachment through the use of six felonies (*People v. Green* (1995) 34 Cal.App.4th 165, 183), and 10 felonies. (*People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 927.) While eight is a high figure, it is a figure that nevertheless fits within the numerical range of offenses that have been used to impeach. (Cf. *People v. Leonard* (2014) 228 Cal.App.4th 465, 496–498 [holding that there was not prejudicial error in excluding a Florida misdemeanor conviction to impeach a witness because, inter alia, the witness had been impeached with

18.

eight felony convictions].) Because the eight felony figure was not actually established, and there is no apparent meaningful difference between a reference to six felonies (which would have been permissible) and eight felonies, we conclude that defendant has not demonstrated prejudice from defense counsel's failure to object.

### 2. *Misconduct During Closing Argument*

#### a. *Deficient Performance*

As quoted above, during closing argument, the prosecutor stated in part: "Reasonable person, it's not someone with eight felonies. It's someone common, [everyday] individuals, it is you, ladies and gentlemen." Defendant contends that this statement meant that individuals like him who have eight felonies can never be reasonable or can never reasonably act in self-defense. After reviewing the jury instructions and the closing arguments, we do not agree with defendant's characterization of the prosecutor's statement.

In context, the prosecutor was discussing the self-defense jury instruction, including distinctions between subjective and objective beliefs. The self-defense instruction in part informed the jury that the defendant acted in self-defense if he reasonably believed that he was in imminent danger and reasonably believed that immediate force was necessary to defend against the danger. The instruction also informed the jury that, when deciding whether defendant's beliefs were reasonable, the jury should "consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." It was in reference to this aspect of the jury instruction that the prosecutor made his "reasonable person" comment. The prosecutor was stating that the reasonable person described in the instructions was an ordinary individual, like the jury members. The prosecutor's reference to eight felonies was an explanation that a reasonable person does not have any extraordinary attributes, such as eight felony convictions. The prosecutor did not expressly tell the jury that the defendant is not a

19.

reasonable person, or that the defendant could never rely on self-defense, simply because he had eight felonies. Therefore, we read the prosecutor's statement as an explanation of who/what a reasonable person is or is not, to wit the reasonable person is an ordinary person and not someone who has eight felonies. The statement was not an argument that the defendant was automatically excluded from self-defense or reasonable behavior because he had eight felonies.

This conclusion is consistent with existing case law. Self-defense requires that a defendant have "an honest and reasonable belief that bodily injury is about to be inflicted on him." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064, italics omitted.) A "reasonable belief" is judged " 'from the point of view of a reasonable person in the [defendant's] position[.]' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083.) A " 'reasonable person' is a hypothetical individual who is intended to represent a sort of 'average' citizen." (*People v. Mendoza* (2007) 42 Cal.4th 686, 703.) The jury must consider all the facts and circumstances confronting the defendant in order to determine whether the defendant acted in a manner consistent with how a reasonable person would have acted to protect himself. (*Humphrey*, at pp. 1082–1083.) Of necessity, the knowledge and circumstances of a defendant will vary from case to case. However, we are aware of no case that holds the reasonable person component of self-defense will likewise vary. Indeed, such a variance is directly contrary to what a reasonable person is—an average citizen. As a result, courts have rejected assessing the reasonableness of a belief through a "reasonable battered woman standard" (*Humphrey*, at p. 1087), "a reasonable gang member standard" (*ibid*.), "a reasonable street fighter standard" (*People v. Romero* (1999) 69 Cal.App.4th 846, 854), or "a reasonable mentally ill person standard" (*People v. Horn* (2021) 63 Cal.App.5th 672, 684–685). While certain aspects of being a battered woman, a gang member, a street fighter, or a mentally ill person may be relevant to assessing a defendant's honest subjective belief or be a relevant part of a defendant's knowledge, the key is whether a reasonable person would have believed that

20.

an imminent threat existed and would have acted in a similar manner as the defendant. (*Humphrey*, at pp. 1086–1087; see also *People v. Brady* (2018) 22 Cal.App.5th 1008, 1015–1017.) Defendant cites no cases in which a "reasonable felon standard" has been accepted, i.e., a case in which the "reasonable person" becomes "a reasonable person with felony convictions." The absence of such a case is hardly surprising since the average citizen is not a felon, let alone a multi-conviction felon. Therefore, when the prosecutor discussed the self-defense instruction and stated that a reasonable person was not someone with eight felonies, his statement was correct.

Our conclusion that the prosecutor's statement was a description of a reasonable person and not an attempt to exclude defendant entirely from self-defense is also supported by the remainder of the prosecutor's closing argument and his rebuttal. After making the eight felony statement, the prosecutor requested that the jury judge defendant by his actions and that defendant's actions did not line up with self-defense. The prosecutor argued that defendant did not seek cover or any kind of obstruction between himself and the black car even though a reasonable person would have done so. The prosecutor also argued that defendant ran after the black car to get the upper hand and shot at the black car as it was driving away. Moreover, in rebuttal, the prosecutor asked the jury to accept hypothetically that defendant had to get a gun, did not know what was going to happen, and was not a felon. The prosecutor then argued that there was still no self-defense because after defendant got his gun, he went on the offensive, chased after the black car, and shot as the black car was driving away. The prosecutor further argued that defense counsel wanted the jury to accept defendant's beliefs without judging defendant's actions, but the jury was there to judge defendant's actions. In other words, at no time after the "eight felonies statement" did the prosecutor ever say that the defendant's eight felonies disqualified him from pursuing self-defense or from acting as a reasonable person would have acted. Rather, the prosecutor clearly highlighted defendant's *conduct* and argued that defendant's *conduct* was not objectively consistent

with self-defense.  That is, the focus was on defendant's actions, not his status as a felon.  Such a focus is appropriate in analyzing claims of self-defense.  (*People v. Humphrey*, *supra*, 13 Cal.4th at 1083 [explaining that for purposes of self-defense, the jury considers the facts and circumstances in determining whether the defendant acted in a manner consistent with how a reasonable person would have acted to protect himself].)  Therefore, the prosecutor's closing and rebuttal arguments were not consistent with an argument that defendant's status as an eight-time felon precluded him from claiming self-defense or being able to act reasonably.

In sum, we do not accept defendant's characterization of the prosecutor's eight felony comment.  We conclude that the prosecutor was commenting about the nature of the reasonable person component of self-defense and was not arguing that defendant's status as an eight-time felon disqualified him from pleading self-defense or from acting as a reasonable person.  Because the prosecutor's statement was consistent with the law, there was neither prosecutorial misconduct nor deficient performance for failing to object to prosecutorial misconduct.

### b.    Prejudice

In the alternative, if we accept that defense counsel was ineffective for failing to object to the prosecutor's eight felony statement, we would conclude that defendant has failed to show prejudice.  Because it is " ' "presum[ed] that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate … attempt[ing] to persuade[,]" ' " if a prosecutor's " 'argument runs counter to instructions given a jury, [appellate courts] will ordinarily conclude that the jury followed the latter and disregarded the former[.]' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676; *People v. Osband* (1996) 13 Cal.4th 622, 717.)  In this case, the jury was instructed through CALCRIM No. 316 that the arguments of counsel are not evidence and was correctly instructed on the law of self-defense through CALCRIM No. 3470.  The self-defense instruction did not mention felonies or felon status in any

22.

fashion. Moreover, defense counsel's closing argument highlighted the self-defense instruction and noted that the prosecutor's arguments were simply a guide. Under these circumstances, there is no basis to believe that the jury followed the single utterance by the prosecutor and failed to follow the written instructions given by the trial court.

### 3. Cumulative Error

Defendant contends that the cumulative effect of the allegedly unchecked prosecutorial misconduct resulted in prejudice. However, "[w]e have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice." (*People v. Duong* (2020) 10 Cal.5th 36, 75; see *People v. Westerfield* (2019) 6 Cal.5th 632, 728; see also *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068 ["There can be no cumulative error if the challenged rulings were not erroneous."].)

## III. Section 654

Section 654 prohibits "multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) In the context of multiple convictions, section 654 may operate to require that one sentence be imposed, but that the other sentences be imposed and stayed. (*Id.* at p. 592.) When applicable, section 654 will also preclude the imposition of concurrent sentences. (*People v. Duff* (2010) 50 Cal.4th 787, 796.)

### A. Counts 1 and 2

With respect to counts 1 and 2, the trial court and prosecutor recognized that section 654 applied to count 2. However, instead of staying the sentence on count 2, the court ordered the sentence to run concurrently with count 1. The parties both agree that this was error.

We also agree that the trial court erred. However, under section 654, the court has the discretion to choose which offense will have a sentence imposed and which offenses will have their sentences stayed, irrespective of which offense carries the longer term. (*People v. Aguayo* (2022) 13 Cal.5th 974, 992, fn. 6.) Considering that the court

23.

sentenced defendant to a total of seven years and recognized that section 654 applied to count 2, we are satisfied that the court intended for count 1 to be the principal non-stayed offense. Therefore, we hold that the sentence on count 2 is required to be stayed pursuant to section 654. (*People v. Deloza*, *supra*, 18 Cal.4th at 591–592; see also *Aguayo*, at p. 992, fn. 6.)

### B. Counts 3 and 4

With respect to counts 3 and 4, the trial court did not discuss the possible application of section 654. The court imposed sentences for both counts to run concurrently with count 2. The parties agree that, because the only ammunition possessed by defendant was in his handgun, the court erred by not staying the sentence for count 4.

"Courts have found section 654 prohibits punishing a defendant for both being a felon in possession of a firearm and unlawful possession of ammunition when all of the ammunition in question was loaded into the firearm or had been fired from it." (*People v. Broadbent* (2020) 47 Cal.App.5th 917, 922; see also *People v. Lopez* (2004) 119 Cal.App.4th 132, 138.) Because there is no dispute that the only ammunition possessed by defendant was in his handgun, defendant cannot be separately punished for both being a felon in possession of a firearm and being a felon in possession of ammunition. (*Broadbent*, at p. 922; *Lopez*, at p. 138.) Unlike counts 1 and 2, however, the trial court did not clearly indicate which count was to be stayed. Instead, the court imposed two-year concurrent sentences for both offenses.

Pursuant to section 1170, the triad applicable to these two felonies is 16 months, two years, and three years. (§ 1170, subd. (h)(1).) Thus, there is no distinction in terms of the possible sentences for these felonies. Given that the triads for these felonies are identical, and the court imposed identical sentences, we see no utility in ordering a resentencing so that the court can decide whether count 3 or count 4 will be stayed. Instead, and because there is no apparent difference or effect from this course of action,

we will accept the parties' arguments and order count 3 to be imposed and count 4 be stayed pursuant to section 654.

## IV.     *Concurrent Sentencing*

The trial court sentenced defendant to two years on count 3 but ordered the sentence to run concurrently with count 2, not count 1.  As discussed above, the five-year sentence on count 2 must be stayed pursuant to section 654.  Defendant notes that counts 3 and 4 were ordered to run concurrently with count 2, and, of course, argued that counts 2 and 4 must be stayed.  However, neither defendant nor the People address the incongruity of making one count run concurrently with another count that must be stayed.  Nevertheless, the parties both agree that the sentence on count 1 should remain, the sentences on counts 2 and 4 should be stayed, and the sentence on count 3 should run concurrently.  Further, since count 1 is the principal sentence (and count 2 must be stayed, in any event), count 1 is the only sentence with which count 3 may run concurrently.  Because the parties are requesting the same result, and because the result is consistent with the seven-year total sentence that was imposed and clearly intended by the court, we will order the superior court clerk to clarify that the sentence on count 3 will run concurrently with the sentence on count 1.

## V.     *Minute Order and Abstract of Judgment*

Appellate courts have " 'the inherent power to correct clerical errors in [the record] so [that the record] reflect[s] the true facts.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  "Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error." (*People v. Leon* (2020) 8 Cal.5th 831, 855.)  Thus, a court's oral pronouncement will control over a clerk's minute order (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2), or over an abstract of judgment (*Mitchell*, at p. 185).

Here, there is no dispute that both the June 28, 2022 abstract of judgment ("June 28 abstract")[6] and the April 4, 2022 minute order ("April 4 order")[7] do not match the court's oral pronouncement of sentence.[8] Both parties agree that the June 28 abstract and the April 4 order should be corrected to properly reflect and coincide with the court's oral pronouncement of sentence.

With respect to the June 28 abstract, because of our resolution of the section 654 issues, an amended abstract will, of necessity, have to be issued. Therefore, we will not order that the June 28 abstract be corrected.

With respect to the April 4 minute order, we recognize that even if this minute order is corrected to properly reflect the oral pronouncement of sentence, the minute order will not accurately reflect the legal and operative sentence that results from this order. Nevertheless, we have the authority to correct a record so that it accurately reflects the true facts and events of a case. (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185.) A true fact of this case is that the trial court imposed a particular, albeit erroneous, sentence on April 4. The erroneous sentence is corrected through this order. In order to correct the errors in the minute order so that it corresponds to the actual oral pronouncement, we

---

**6** The original abstract of judgment was entered on April 7, 2022, and a new abstract of judgment was entered on June 28, 2022. The June 28 abstract of judgment is the operative abstract.

**7** The original minute order was entered on April 4, 2022, but was amended on April 6, 2022, and again on April 13, 2022. Therefore, the operative minute order is the April 4 minute order as amended on April 6 and April 13. For purposes of this order, we will simply refer to the operative minute order as the April 4 order.

**8** The April 4 minute order shows that count 1 is to run concurrently with count 2; the sentence on count 1 is five years and stayed, and the sentence on count 2 is the midterm of three years, plus an additional four years on the personal use enhancement. To properly reflect the oral pronouncement, the minute order should show that the sentence on count 1 is the midterm of three years, plus an additional four consecutive years for the personal use enhancement, and that the sentence on count 2 is the midterm of five years, concurrent to count 1, and not stayed.

26.

will follow the parties' request and order that the April 4 order be amended to accurately reflect the April 4, 2022 oral pronouncement.

## **DISPOSITION**

The clerk of the Tulare County Superior Court is directed to correct the April 4, 2022 minute order to conform with the court's oral pronouncement of sentence on April 4, 2022, as found at pages 607–609 of the reporter's transcript and as described in footnote 8 of this opinion. The clerk of the Tulare County Superior Court is also directed to issue an amended abstract of judgment reflecting the following sentence: on count 1, three years (the midterm), plus a four-year personal use of a firearm enhancement; on count 2, five years (the midterm), stayed pursuant to section 654; on count 3, two years (the midterm), concurrent with the sentence on count 1; and on count 4, two years (the midterm), stayed pursuant to section 654. In all other respects, the judgment is affirmed.